OPINION OF THE COURT
Ellen Gesmer, J.
In this action, both defendant A.D. (father) and plaintiff M.R. (mother) seek primary custody of their son, J., born on November 25, 2003. The court held a 10-day custody trial, at which both parties testified. The mother also called as witnesses Dr. Rebecca Farber, J.’s pediatrician; Dr. William Winter, the psychiatrist for J.’s 13-year-old half sister A.; two friends of Ms. R.; and the mother of a child who goes to school with J. The father introduced the testimony of the principal of J.’s school; J.’s kindergarten teacher; D.M., Mr. D.’s girlfriend; J.’s first grade teacher; Denise Trocchio, a private investigator; and the secretary at J.’s school. In addition, the court received in evidence the report of Dr. Steven Demby, who was appointed by the court to conduct a forensic mental health examination of the parties, and each party was permitted to cross-examine him.
J. is a sweet, rambunctious and energetic little boy with significant learning deficits who needs nurturing, structure, and rules that are firmly enforced. Neither of these parents can meet his needs alone. Ms. R. is warm and loving, but her home is chaotic, unpredictable and stressful, and she cannot and does not establish firm or consistent boundaries or limits on J.’s behavior. On the other hand, the father is not a particularly warm or affectionate parent, but he can set firm standards for J.’s behavior, and has had the good sense to find a partner who has the skills and qualities he lacks and with whom he has created a calm and predictable family environment at home. Consequently, as more fully explained below, the court will fashion an access schedule and a decision-making plan that will *514 give J. the benefit of the strengths of each parent and hopefully minimize the damage to him from their respective weaknesses.
Findings of Fact
The court makes the following findings of fact, based on the testimony and exhibits introduced at trial.
Credibility
The court evaluated the credibility of each witness based on several factors, including but not limited to the consistency of the witness’ testimony; the contradictions within the witness’ testimony and with that of other witnesses and exhibits; the witness’ affect and manner on the witness stand; and the witness’ ability and willingness to answer questions candidly and without hesitation.
The court finds that neither the mother nor the father was entirely credible. The mother’s testimony was frequently muddled, and she often had a difficult time answering even simple questions. These tendencies on the mother’s part were also observed by Dr. Demby, who made similar observations about her communications with him. The mother repeatedly demonstrated that her perception of events is colored by her hopes and wishes, consistent with Dr. Demby’s observation that she frequently engages in wishful thinking and denial. For example, although Mr. D. had refused to make any commitment to her during the two years that they were dating, she was still shocked to learn that he was dating another woman. The mother’s pattern of testifying to what she wished had happened as if it had actually happened often led to inconsistencies between her testimony and both her own prior statements and statements of third parties. For example, she insisted at trial that her ex-husband had not been violent toward her, even though she had sworn in her divorce complaint against him that he had punched her and tried to strangle her. She also testified that she was given custody of their daughter, A., after a trial, although in fact she had obtained custody by agreement. She also testified that the court had ordered that J. spend Tuesday nights with his father, although in fact she had agreed to that. She said that she always got J. to school on time, even though the school records show otherwise. She testified that the early morning sessions that J.’s teacher wanted him to attend, and that she often did not get him to school for, were “optional,” and she also dismissed their importance by claiming that she could do the same work with J. at home.
*515 The mother’s testimony was also filled with internal inconsistencies. For example, she insisted to Dr. Demby and in her testimony that J. was completely toilet-trained by November 2007. However, she swore in an affidavit (in which she tried to limit the father’s access) in April 2009, when J. was 5x/2 years old, that J. was still using a diaper at night at that time. She also testified that she called Mr. G., a boyfriend with whom she had had a violent incident, on a pay phone because her cell phone was not working, although she was observed using her cell phone the same day. She testified contradictorily that Mr. D. had not given her back the workbook that J. received at the end of first grade, and that he returned it to her without having completed it. Sometimes her testimony was simply absurd, as when she testified that Mr. D. had given her “permission” to spend time with Mr. G.
The court also finds that Mr. D. is not entirely credible because he frequently described events in the manner most flattering to himself, without taking responsibility for his own role in them. For example, he said that he was “unable” to change diapers, which is absurd; he simply refused to do it, clearly believing that it was beneath him. He also testified to matters of which he could not possibly have personal knowledge, such as what J. eats at his mother’s house.
I found Dr. Demby’s testimony to be credible. I found particularly credible and reliable his descriptions of the parties, his psychological assessments, his description of the conflicts between them and his analysis of their parenting strengths and weaknesses. I relied much less on his recommendations which, as he acknowledged, he could state with far less certainty.
I found credible the testimony of Ms. M. and the principal and teachers from J.’s school. I found Ms. Trocchio credible as to her descriptions of events, but I found less credible her characterizations of Ms. R.’s appearance. I did not find the testimony of the school secretary or the mother of J.’s schoolmate particularly helpful.
I did not find Dr. Farber credible, since she denied having made every statement attributed to her by Dr. Demby. While Dr. Winter’s factual observations of what occurred in his presence were for the most part credible, I did not rely on his analysis of the family as a whole, since he only had information from the mother, and his conclusions about the family as a whole were overly simplistic.
*516 The Parties’ Backgrounds
The mother had a conventional middle-class suburban upbringing. She was raised in a nurturing and loving family, consisting of a hardworking father, a college-educated mother and an older brother.
Early in her college years, Ms. R. was hit by a drunk driver in a serious automobile accident, was hospitalized with a concussion, and missed an entire semester of school because of her injuries. Although she testified that she was not at fault and had insurance, she allegedly never sued the other driver or arrived at any settlement. She then attended two other colleges before graduating.
After college, she worked as a paralegal, went to law school for two years, and then started working in real estate. She never returned to law school. Although she said she dropped out for financial reasons, she does not appear to have applied for any loans in order to complete the last year of her degree. She married, had a daughter, A., and divorced within three years.
Mr. D.’s father left the family when Mr. D. was in the second grade, and never provided any support for the family. Mr. D. was raised by his mother, a seamstress, and his maternal aunt and uncle who lived with them in a two-family house in New Jersey. He had an older brother and younger sister. He described his mother as loving but “tough” and not averse to minor corporal punishment. By third grade, he was working to help support his family. He played football in high school and attended college on a football scholarship. After three years he had two knee surgeries that ended his football career. When Mr. D. graduated from college, he had no financial resources. He got an entry-level job in the title insurance business and then worked his way up in that field for many years. Ultimately, he started his own company with a woman partner with whom he had worked for many years. He and the partner worked together for seven years until she fell ill and he bought out her share of the business.
Mr. D. was married in his mid-20s, lived in New Jersey, and had three children with his wife. Although he worked long hours, he made an effort to drive back to New Jersey from Manhattan to attend his son’s hockey and little league games or see his daughters in their sports activities, recitals and other performances. He was divorced in about 1997, after approximately 23 years of marriage.
Mr. D. remains close to his family, spending many weekends and holidays with his brother and his brother’s grandchildren, *517 his sister and his sister’s grandchildren, his own children and grandchildren and his nieces and nephews. Two of his three children from his marriage have Master’s degrees and the third has a law degree. He sees and speaks to his adult son several times a week, and he sees his married daughter and her twins, who live in New Jersey, frequently. He is not currently speaking with his other adult daughter. Although Mr. D. is confident that his relationship with her will improve, he has not done anything to bring that about.
The Mother and the Father’s Meeting
The mother and the father met in the early 1990s in New York City, where they both lived. They were platonic friends before, during and until Ms. R.’s divorce from her first husband. Mr. D. was supportive during her separation and divorce and encouraged her to maintain her marriage for the sake of her daughter. She told him that her husband had been abusive to her and, she feared, sexually abusive to A.
Ms. R. and Mr. D. started dating in or about August 1998. Soon after, they began an intermittent intimate relationship. He stayed at her home a few nights per week, and they took several luxurious vacations together. From in or about 1998 to 2008, Mr. D. supported Ms. R. by giving her $22,000 per month, and also gave her expensive gifts. However, he refused to make any permanent commitment to her and did not hide from her that he had other girlfriends. Nonetheless, Ms. R. convinced herself that Mr. D. would take care of her financially for the rest of her life. At that time he was traveling extensively as the owner of New York Land Services, his title insurance company, and she was working as a real estate broker.
1998-2003
In 2001, one of the other women whom Mr. D. was dating contacted Ms. R. Although Mr. D. had always told her that he was seeing other women, Ms. R. was very upset by this, and impulsively decided to move with her then-three-year-old daughter to Florida. She and A. moved in with her former husband in Florida, even though he had been violent toward her during their marriage and she had concerns that he had been sexually inappropriate with A. Within a few months, he was again violent, and she moved with A. to another address in Florida. 2003-2007
Mr. D. continued to visit Ms. R. in Florida. In 2003, Ms. R. became pregnant by Mr. D., although she claimed that she was *518 using birth control at the time. She returned to New York to give birth, and J. was born on November 25, 2003. Mr. D. was at the hospital when J. was born.
After J. was born, the mother and the father continued to live separately. J. lived with the mother and his half sister, A., then about six years old, in an apartment on East 77th Street. Mr. D. had a corporate apartment in the East 30s, which was totally unsuitable for a child, and a house in New Jersey.
When J. was an infant, Mr. D. traveled outside New York on business for about one third of each year. When not traveling on business, he drove in from his home in New Jersey on Saturday and Sunday mornings and often spent a whole weekend day with the mother and J, going to visit Mr. D.’s family or friends, or on some other outing. They all went on vacations together. Initially, the father paid for 24-hour, 7-day-a-week nannies for Ms. R, and he continued to pay for a nanny until the summer of 2007. When J. was an infant, Mr. D. never changed J.’s diaper, gave him a bottle or a bath, put him to bed, or even held J.; when he visited, he just looked at him.
As J. got older, Mr. D. visited him more frequently, taking him for walks in the stroller, to play in the park, or to visit a friend. On these excursions, he was always accompanied by the nanny.
Ms. R. suffered from depression, and was prescribed medication for it in 2004 and 2005. Mr. D. often denigrated Ms. R. and cursed at her, sometimes in front of J. At social events, he was often rude and condescending to her. At trial, he could not think of anything positive about Ms. R. as a parent.
In the early years of J.’s life, his parents were able to work together to make important decisions for J. Generally, it was the mother who recognized J.’s early developmental issues and needs and took the initial steps to address them. She would explore the available options, and then discuss her research with the father who would offer his opinion and, on occasion, made his own inquiries. The father did not at any time disagree with any of the mother’s eventual decisions as to J.’s special needs. The father paid for all of the expenses related to addressing J.’s special needs, other than those paid for by the Board of Education.
The mother recognized that J. had a tongue problem from birth, and that he had speech and motor difficulties. She found doctors and appropriate services for him, including occupational therapy. The father was initially uneasy about the tongue *519 surgery because he was concerned about such a young child having general anesthesia, and he conferred with doctors about it. Ultimately the tongue surgery was performed and the father was present and waiting for him when J. was brought to the recovery area. After the surgery, J.’s speech improved.
Ms. R. also correctly observed and addressed J.’s balance problems, which Mr. D. had not noticed. As a result of Ms. R.’s advocacy, some of the services that J. needed were paid for by the Board of Education, including the special education itinerant teacher (SEIT) assigned to J. in nursery school.
The mother researched prekindergarten schools and told Mr. D. what she thought they should do. Mr. D. occasionally offered opinions which she considered. For example, Mr. D.’s dislike of the director at J.’s nursery school was one reason that she moved J. to his current school for prekindergarten.
The mother also found various classes and activities for J. The father did not approve of J. attending art classes at the 92nd Street Y near his school, or hip-hop classes, which the father asserted were “not for boys.” Ultimately, the father signed J. up for baseball without discussing it with the mother first. J. enjoyed baseball and continued to participate in that extracurricular activity.
When J. started to attend prekindergarten at Church of the Epiphany in 2006 at age three, the father picked him up from school and took him for a walk or to the park two or three times a week, and continued his overnight and weekend visits.[1] Every summer from at least the time J. was three years old up to and including the summer of 2007, the parties spent the last two weeks of August with him in Cape May.
Once J. started school full time, the father urged the mother to find a job, and he continued to do so until their relationship ended. She never did so.
2007-2008 School Year
From at least as early as 2007, third parties began to notice Ms. R.’s inability to maintain a serene and relaxed environment, her deteriorating personal appearance, and her inability to set limits for her children.
On one occasion in mid-2007, when Mr. D. went to pick up Ms. R. and J, she came down almost an hour late. He became angry at her. In response, she began screaming, and began bang *520 ing her head on the front seat of the car. She then fainted. Mr. D. then took her to the hospital. Within a few months of that incident, during another argument Ms. R. spit at Mr. D. At that point, the father resolved never to go into her apartment again, and told her that their relationship was over.
In or about March 2007, the father met D.M. and, by that fall, they were in an exclusive and committed relationship which continues to this day, although Mr. D. is not engaged to Ms. M. and he has not provided for her in his will.
In September 2007 J. moved from prekindergarten at his nursery school to prekindergarten at his current school. While he was there, the Board of Education identified him as having special needs, so he received an assessment which resulted in the adoption of an individualized education program (IEP) listing the special services he needed, including speech and occupational therapy. The father has attended all of J.’s annual IEP meetings, except for the very first IEP meeting in 2007. While J. was at his current school, the father occasionally dropped him off or picked him up from school, and spent some time on weekends with him.
Mr. D. had promised J., before the head-banging and spitting incidents, that he would take him to Disney World at Christmastime. Therefore, although he had told Ms. R. that their relationship was over, he paid for J., the mother, A. and the mother’s mother to go to Disney World at Christmas 2007 and met them there later. Apart from that trip, Mr. D. saw J. when he took him to, or picked him up from, school, took him to the park or for a walk in the stroller. He sometimes had dinner with him on the afternoons that he picked him up, and on weekends, he took J. to New Jersey or Westchester to visit friends or family, accompanied by the nanny. The nanny brought J. down so that the father did not have to go up to the mother’s apartment.
The father took J. to meet Ms. M. in February or March 2008. In preparation for the March visit, Mr. D. and Ms. M. had rearranged his Manhattan apartment to make it more appropriate for a child, and Ms. M. bought toys. During the visit, they played, went to the park, had dinner and then the father took J. home. He then told Ms. R. that he had introduced J. to a woman friend. While Mr. D. believed that he had been clear in explaining that he had introduced J. to a woman with whom he was having a significant relationship, Ms. R. did not understand that from the conversation. It is most likely that he was not as clear as he believed that he was being, and that Ms. R., who still *521 did not accept that their relationship was over, resisted understanding the implication of what he was saying.
Before that March 2008 visit, Mr. D. had rarely, if ever, spent time with J. alone. Rather, he usually was accompanied by J.’s nanny, even for a day visit, because J. was not toilet-trained and Mr. D. was not willing to change diapers. In March 2008, Ms. M. volunteered to take over that chore when J. visited with his father. In fact, J. came bearing a diaper in his backpack which J. insisted they put on him if he needed to have a bowel movement. Soon after Memorial Day 2008, he stopped using pull-up diapers completely.
In May 2008, Mr. D. and Ms. M. took J. to New Jersey for the Memorial Day weekend. The mother finally accepted at that point that Mr. D. was dating another woman and that their relationship was over.
After Memorial Day 2008, the father asked for J. to be with him every weekend that Mr. D. was not traveling. From then on, J. was with his father, on average, two out of every three weekends. After one weekend with his father, J. returned home with a fever. Ms. R. took him to the doctor the next day and he was diagnosed with whooping cough. Mr. D. had not observed that J. was ill. This happened on at least two other occasions.
In or about March 2008, Mr. D. advised Ms. R. that, given the end of their interpersonal relationship and her refusal to obtain employment despite J.’s being in school full time, he would no longer provide the same level of support for her, since, up until that time, he had been providing enough support for her, her daughter and her mother (who was at that time living most of the time with Ms. R.). He told her that he would continue to support J. Over the next seven months, he gradually reduced the support he was giving her to allow her time to make arrangements for her own support. By November 2008, he had reduced her support to $5,000 per month, where it remained. Between March and October 2008, Ms. R. did not look for a job and did not heed Mr. D.’s advice to move to a more affordable apartment.
In November 2008, Ms. R. stopped paying her rent, ultimately accumulating tens of thousands of dollars in rent arrears. Mr. D. had previously paid seven months of security, totaling $70,000 to $80,000, which the landlord applied to Ms. R.’s rent as it became due, until the security was gone. There were still thousands of dollars of unpaid rent by the time the mother finally moved out of that apartment.
*522 During the 2007-2008 school year, Ms. R. inappropriately confided in many of the school personnel. She told A.’s fifth grade teacher (later, J.’s second grade teacher), that she was being kicked out of her apartment, although she was not being evicted at that time; in J.’s presence, she told J.’s SEIT in prekindergarten about her problems with Mr. D.; she complained to the secretary at J.’s school, and sometimes bickered with A. in front of her. She continued to complain to J.’s prekindergarten SEIT even after she was asked to stop. In these conversations, she portrayed herself as a victim. Both J.’s teachers and the school principal observed that she was disheveled and had difficulty articulating her thoughts.
Upon completion of the 2007-2008 school year, J.’s instruction from his SEIT came to an end. She planned a special goodbye celebration that Ms. R. failed to attend. In summer 2008, the father, Ms. M. and J. spent the last two weeks of August at Cape May.
At some point in 2008, Ms. R. started psychotherapy sessions with Dr. Roberta Leff, which continued sporadically for about a year. She brought A. for several sessions, and J. occasionally. Dr. Leff recommended that Ms. R. get a good physical exam for A. and a learning evaluation for J.
2008-2009 School Year
J. entered kindergarten in September 2008. He was placed in a collaborative team teaching class (CTT) with a special education teacher, a general teacher and a small number of students, many of whom had IEPs.
Early in kindergarten, J.’s teacher determined that J. would benefit from extra help, and he was offered the opportunity to attend four early morning enrichment classes each week. Those classes had only five or six students who received individualized help. The classes started at 7:50 a.m. before the 8:35 a.m. start of the regular school day. Ms. R. only brought J. to the early morning class at most three times per week, because she felt that was enough. Sometimes she took J. out for breakfast instead of dropping him off in time for the early morning class. When the mother did bring him to the early classes, he was often late, and, on days when he skipped the early class, he was often late for school. She also often failed to pick J. up on time after school and he was relegated to the late table to wait for her arrival. When she did arrive, she appeared frazzled, and often told J.’s teacher that she was late because Mr. D. was having her evicted.
Ms. R. claimed that she told J.’s teachers about her eviction so that they could be on the lookout for any behavioral problems *523 J. might develop because of it. However, she also testified that she did not tell J. that they were moving until shortly before the eviction became final, which was in December 2009. Consequently, telling his teacher would have only been appropriate in late December 2009 or early 2010 when he was in first grade, not when he was in kindergarten.
The mother enrolled J. in Hebrew school during kindergarten. The father later objected to J. continuing with Hebrew instruction, so he did not continue after kindergarten. The mother usually celebrated the Jewish High Holy Days, Passover, and Purim with J. The father, who is not particularly religious himself, has never objected to J. celebrating Jewish holidays. Indeed, he has even celebrated Jewish holidays with J. himself, after getting some tips about how to do so from a Jewish friend. The mother also enrolled J. in an acting class, which the father did not approve of, so he did not attend the class show. The mother also enrolled J. in music and gymnastics classes, which J. had taken previously.
During the 2008-2009 school year, as the mother became increasingly less reliable, the father began to take the lead in identifying and addressing J.’s educational needs, as the mother had done in J.’s early years.
In November 2008, J.’s teacher called the father to advise him that J. was habitually late to both the early and regular classes and had just missed an entire week of the early classes. The father then proposed to the mother that he take J. to school every day when he was not traveling, as he was concerned about J. attending the extra classes. Ms. R. agreed, and, from that day to the present, except when traveling on business, the father has taken J. to school every day, on time. Mr. D. is pleased that this arrangement allows him to spend more time with J. Mr. D. arrives at Ms. R.’s building at about 7:20, so that he can get J. to school in time for the early class at 7:50. On most days, J. comes down to the lobby by 7:30 or 7:35. Sometimes, however, he does not come down until 7:40 or 7:45, making it difficult for him to get to the early class on time.
In late 2008 or early 2009, J.’s teacher recommended that J. have tutoring. Ms. R. did not take any steps to obtain a tutor for him, even though Mr. D. said he would pay for a tutor.[2] In or about April 2010, Mr. D., with the help of Ms. M., found J. a tu *524 tor. He arranged an initial session for J. to meet with her, and decided that she was a good fit with J. He then asked Ms. R. to try her as well and let him know her opinion.
J.’s teacher also recommended that J. be evaluated, and Ms. R. undertook to find a facility to conduct the tests. However, she did not find one. Eventually, Mr. D. made arrangements for J. to be evaluated by the Yellin Center. He put down a deposit and informed Ms. R., who only then gave him names of some potential evaluators.
During the 2008-2009 school year, J. spent Thanksgiving, Christmas and nine days during his March break with his father, as well as most weekends. Both Ms. R. and Mr. D. attended reading and math days and publishing parties at the school.
In November 2008, Mr. D. and Ms. M. moved together into an apartment downtown where J. was given the bedroom closest to theirs. Mr. D. had told J. that he and Ms. M. were expecting a baby, and E was born in April 2009 (she is named for the aunt who helped raise Mr. D.). J. was excited about the baby and nicknamed her “Cupcake.” He is very affectionate with his little sister. Mr. D. decreased his traveling significantly that year.
Ms. R. commenced this action in April 2009. At that time, her lease had expired but she had not moved, her security deposit had all been used to pay her unpaid rent, and she had received a notice of eviction. She had not looked for employment. In an order dated June 29, 2009 (the order) deciding Ms. R.’s pendente lite motion and Mr. D.’s cross motion for visitation, this court directed Mr. D. to pay Ms. R. $5,000 per month as child support, to maintain health insurance for J. and pay his unreimbursed medical expenses, and to guarantee a lease for the mother for one year, with a monthly rent that did not exceed $6,500 per month. The order also set an access schedule for the father and J. Although he did not think it was in J.’s best interest to live primarily with his mother, he did not seek custody at that time. 2009-2010 School Year
J. started first grade in September 2009. The father continued to take him to school every day except when he was traveling. After the father came back from a business trip in the fall, J.’s teacher told him that J. had not been on time for the early morning class at all while the father was away. That was one of the factors that caused Mr. D. to seek sole custody. Ms. R. often went to the school very upset and told the school principal three *525 or four different times that she was being evicted and had to move because the father would not pay her rent and she had no money. The school principal did not encourage Ms. R. to share such personal information and observed that she was “excited” and “rambling” and always in “crisis mode.”
The father again signed J. up for after-school activities without first discussing them with the mother, including wrestling, sports, and baseball. J. did not always attend the activities for which the father had signed him up. He continued to enjoy baseball, however, where he had friends.
In summer 2009, A.’s arm became paralyzed. Ms. R. consulted with various health practitioners, but delayed in getting appropriate treatment. Ultimately, no physical cause for the paralysis was diagnosed. In November 2009, the mother consulted with Dr. Winter, who began treating A. with hypnosis. The mother frequently brought six-year-old J. along to the hypnosis sessions. Dr. Winter observed that A. was excessively dependent on her mother, and also that Ms. R. allowed herself to be bullied and manipulated by A. He also observed that Ms. R. inappropriately relied on A. for emotional support. He further noted that Ms. R. was needy and relied on him for support. He discussed with Ms. R. the importance of setting limits for the children and being more assertive. He concluded that Ms. R. needed long-term therapy in order to learn to be more assertive and less permissive, and to set boundaries for her children and be a more effective parent. As of the date of trial, Ms. R. had not entered into therapy. Dr. Winter also recommended that A. return to him for therapy but, except for one visit with her after camp, he has not seen her since June 2010.
Other professionals made similar observations about the mother’s failure to set appropriate boundaries for the children. Dr. Marks reported that J. and A. misbehaved in his waiting room and that the mother did not properly intervene. J.’s SEIT observed that the mother had failed to intervene when A. was pinching J. Dr. Leff noted that Ms. R. failed to intervene when A. and J. were hitting and pushing each other.
While J. was in first grade, Mr. D. began to become more involved in J.’s medical care, just as he had become more involved in J.’s education when J. was in kindergarten. Concerned by J.’s frequent illnesses, fatigue, headaches, fever and lack of well-being, he took him to Dr. Farber for a complete blood analysis. However, when the doctor disagreed about the necessity for it, Mr. D. stormed out before the blood analysis *526 was completed. When Ms. R. took J. to Dr. Donald Marks for a dental check up when he was five years old, Dr. Marks found a significant plaque condition and told the mother to return for a follow-up visit. She did not do so, and eventually, Mr. D. took J. to see Dr. Marks. However, Mr. D. remains unfamiliar with some of J.’s basic medical issues, such as his allergies.
In summer or fall 2009, the mother submitted to the father applications for various apartments on which the guarantees demanded by the landlords were not consistent with the order. The father refused to complete those applications. He then found two apartments near where the mother was then living where the landlords would accept a one-year guarantee in conformance with the order. The mother rejected both. Although the mother claimed that the father had refused to comply with the order by, for example, imposing additional conditions on the potential landlords, she did not produce any leases with one-year guarantees that conformed to the order that the father refused to sign. In contrast, the father produced documents that showed that the various guarantees that Ms. R. had described as appropriate were, in fact, not in conformance with the order. In December 2009, Ms. R. located an apartment with a lease with an appropriate guarantee, and the father signed it immediately.
In December 2009, Ms. R. was evicted from her old apartment a few weeks before she could move into the new apartment she had finally found. She stayed in a hotel for two weeks; during that time, Mr. D. took J. to school.
After two weeks, Ms. R. decided to move from the hotel into the one-bedroom apartment of her friend, Mr. G., along with J., A., and her mother. On January 18, 2010, Mr. G. assaulted Ms. R. in his apartment and threw her across the room. J. was present at the time. The mother suffered bruises, scratches and back pain and was taken to the hospital. Mr. G. was arrested and the Criminal Court issued an order of protection in favor of the mother and against Mr. G. Ms. R. minimized the incident when testifying about it at trial. As a result of the incident, she was unable to take A. to her doctor’s appointment the next day and her elderly mother went in her stead. Only a few months after the incident with Mr. G, Ms. R. resumed her relationship with him, and went together with him and J. to a concert in Central Park. In July, she, J. and Mr. G. went to the Hamptons for the day and stayed overnight in a hotel where they all slept in one room.
*527 In or about early 2010, the mother’s former landlord obtained a judgment against her for approximately $80,000 in back rent. To prevent the mother from having to file for bankruptcy, the father settled the claim by paying $50,000 on her behalf.
Ms. R. did not organize a bedroom for J. in her new apartment on East 38th Street until months after they moved in. Mr. D., at Ms. R.’s request, had bought an entire bedroom set for J., but she did not have it delivered, because she had boxes stored in his room. The furniture was only delivered after Mr. D. obtained court intervention.
After Ms. R. moved into her new apartment, she found it difficult to manage having A. in a school on the westside while J. was in a school on the eastside. She took A. to school and picked her up every day. Although she claimed that she picked up J. every day, that was clearly not possible. Instead, Ms. R.’s 81-year-old mother, who has difficulty walking, often picked up J.
In spring 2010, the mother started calling and visiting the secretary at J.’s school repeatedly, campaigning for J. to get school bus transportation in the coming school year. Ms. R. told Ms. Cruz that she was being evicted and had to move, although by that time, she had already been in her new apartment for five months. Both the school principal and secretary told Ms. R. that J. was not eligible for bus service, and referred her to the Board of Education. She nonetheless continued to call the school secretary regularly.
Ms. R. also called Dr. Demby and left long, rambling messages, and she called Mr. D. repeatedly, both at his office during the day, and at home, often late at night, leaving messages until the mailbox was full.
In or about March or April 2010, the mother refused to let Mr. D. take J. to school unless he paid for sleep-away camp for A. On the next court date, in April 2010, at Mr. D.’s request, the parties entered into a so-ordered stipulation which formalized the arrangement that the father would take J. to school every morning, provided that the father would pay for tutoring, extended his Tuesday afternoon visits to overnights, and established that J. would spend four weeks with him that summer. He requested this to prevent any further interruption of the morning routine.
In May 2010, the mother proposed to the school principal that J. be transferred to a school on the westside near A.’s school, which would be more convenient for her. She made that *528 proposal even though she believed that the area around A.’s school was unsafe. At no time did she advance a reason as to how the change in schools would benefit J.
The father continued to make sure that J. got to the extended morning program every day on time. He also decreased his travel commitments to about 30 days per year. During the 2009-2010 school year, the father went on two class trips and exercised all of his allotted access time with J. He also had the tutor come to his home on both Saturday and Sunday for IV2 hours when J. was with him for the weekend. Ms. R. arranged for the tutor to come to her home on only one weekend day each weekend that J. was with her, telling the tutor that she had other plans with J. for the other weekend day.
As Ms. R.’s life became increasingly unstable, Mr. D. created a structured and dependable environment for J. in his home. He, Ms. M., J. and E eat dinner together every night and breakfast together in the morning, generally at the dining room table. Mr. D., or, more often, Ms. M., oversees J.’s homework, reads books with him, and has him write stories.
J.’s school work has improved greatly since the middle of kindergarten, coincident with the father’s greater involvement. Dr. Demby attributed J.’s improvement to Mr. D.’s involvement, although Ms. R. claimed complete credit for it.
In summer 2010, J. went to day camp, paid for by the father, and spent the allotted four-plus weeks with the father. At the end of first grade, J. received his report card, attached to which was a list of books to read over the summer, and a word list to review. Mr. D. bought four or five of the books on the reading list, as well as others, and reviewed the word list with J. All told, J. read about a dozen books while with the father for four weeks.
2010-2011 School Year
J. is now in the second grade, and continues to be placed in a collaborative team teaching (CTT) classroom. The mother completed an emergency contact sheet for J.’s school that listed Mr. D. as the third choice, after herself and her mother.
On the first day of J.’s second grade, Wednesday, September 18, 2010, the father picked up J. to take him to school and learned for the first time that the mother had arranged for J. to go home that day on a school bus. In addition to being surprised by this news, Mr. D. thought that it was not appropriate for J. to be on a large school bus, with children whom he did not *529 know. Apparently, the mother had prevailed upon someone at the Board of Education to put J. on a bus route, even though neither the school principal nor secretary could explain how the mother was able to obtain bus service. The mother testified that this year she is either at home to meet J.’s bus, or her mother picks him up and Ms. R. comes home soon afterwards. However, I find that she frequently does not return home until much later.
On hearing from the mother that J. would be going on the bus on the first day of school, the father checked with the school office and learned that J. was not scheduled for bus service that day. Calls were made to the mother’s attorney to make sure the mother knew that there was no bus service and that she must arrange to pick up J. She could not be reached, so at 2:00 p.m., having received no response, the father left a business meeting to pick up J. Finally, word was received that the mother had made appropriate arrangements, and the father stopped in his tracks. However, at 3:10 p.m., he received a call from the school saying that J. was still there, and they could not reach Ms. R. Mr. D. immediately went to the school, picked up J. and brought him to his apartment. Since it was not the father’s access day and was also the first night of Rosh Hashanah, the mother’s attorney was assured by e-mail that the mother could pick up J. from the father’s home at any time. Nonetheless, the mother accused the father of snatching J. from school on her access day in order to deprive her of the holiday. In addition, although it is school policy that parents should not use bus services for children in kindergarten through second grade for the first two weeks of school, the mother denied that she ever received such information.
In addition to her false claim that the father had deliberately tried to deprive her of spending Rosh Hashanah with J., the mother made a number of other complaints about the father that ultimately turned out to be untrue. For example, prior to Friday, September 17, 2010, the first night of Yom Kippur, the mother had never broached the subject of the holiday with the father, either directly or through attorneys, although it was the father’s scheduled weekend. That morning, Ms. R. unilaterally instructed the school to put J. on the bus that afternoon. When the school secretary called Mr. D. to confirm whose weekend it was, Mr. D. decided to voluntarily give up his time with J. so that he could celebrate the holiday with his mother. At trial, the mother first testified that it was her weekend; and later acknowledged that it was not.
*530 The mother also complained during trial that the father often forgets to give her J.’s cell phone, but she later acknowledged that, even if he had done so, she would not have been harmed by it.
The mother also accused the father of removing J.’s homework from his folder deliberately to make it appear that she had not helped J. the night before. She further testified that J. complained that he had gotten into trouble for not having his homework and that his teacher wrote her a note about it. I credit the testimony of his current teacher that there was no day this school year that J. did not have his homework, that neither she nor her co-teacher called the mother or sent home any notes about missing homework, and that J. never got into trouble because of his homework.
Finally, the mother complained that the father has taken over J.’s play dates but she eventually acknowledged that he only arranged play dates on days J. was with him, leaving her free to make whatever play dates she wished on her days.
The father attended three out of three morning math and reading classes from September through November 2010, while the mother only went to one. The mother blamed her failure to attend on the father’s interference with the flow of information to her, even though all school events are posted on the Internet. J.’s second grade teacher communicates with parents by leaving notes for them in each child’s folder. Ms. R. often asks J.’s teacher questions to which she would know the answers if she looked regularly in J.’s folder. Mr. D. sees J.’s second grade teacher every morning; Ms. R. only saw her once or twice in the first three months of the school year.
J. was evaluated by the Yellin Center, which issued a report on his strengths and weaknesses on October 8, 2010. Among its specific recommendations are that J. have a specific time for doing homework in each of his homes, and that his TV viewing be strictly limited. The father followed the recommendations of the Yellin Center by buying J. video books, certain magazines and special pencils. The report suggested that each parent schedule a meeting with the Yellin Center, but, as of the date of trial, Ms. R. had not done so, and she did not testify as to any actions she took to follow the Yellin report.
The mother continues to behave in ways that call into question her ability to provide stability for J. For example, at a school event on Saturday, October 23, 2010 that Ms. R. and J. attended, Ms. R. left the school area without J. and she had to double back to retrieve him.
*531 On Halloween 2010, Ms. R. misplaced J.’s costume. When Mr. D. picked up J. to take him trick or treating and J. had no costume, he arranged for Ms. M. to buy an identical one.
When J. was in a race in Central Park on Saturday, November 13, 2010, a weekend that occurred in the midst of the trial, the mother arrived at Central Park when the race was over.
The Forensic Report
In September 2010, Dr. Demby issued his forensic report, in which he recommended that J. reside primarily with his father during the school year, spending alternate periods of Thursday after school to Monday morning with his mother, and one other overnight during the alternate weeks, and that the parties reverse the schedule during the summers. He further recommended that J. spend the majority of his vacations and holidays with his mother. He recommended that the parties meet with a parenting coordinator to assist them in implementing the change.
With regard to decision making, he recommended that Ms. R. have final decision making with regard to religion, education, camp and mental health care, and that Mr. D. have final decision-making authority with regard to extracurricular activities and medical care. Dr. Demby views parenting coordination as “an essential intervention” for these parents, and recommended that the parties consult with each other concerning decisions about education, extracurricular activities, medical care and mental health using a parenting coordinator. He also recommended that both parties engage in individual therapy.
After reading Dr. Demby’s report, Mr. D. changed his proposed parenting plan to mirror in most respects Dr. Demby’s recommendations.
Dr. Demby explained that he perceives his role as assessing the child’s needs and the parenting capacities of each parent, and the fit between the two. He explained that parenting capacity includes many factors such as providing a stable environment; keeping a child safe; establishing two-way communication; setting appropriate limits; conveying affection, love, and emotional support; fostering the child’s development; being empathetic; and encouraging the child’s relationship with the other parent. He further explained that the ideal parent is one who is authoritative, but who balances and combines firm limits with warm nurturing.
J. is sweet, affectionate, imaginative and open. He is also fidgety, impulsive and anxious. Like many children of parents *532 who do not get along, he is aware that his parents “fight,” and believes, rightly or wrongly, that he is the subject of their fights. He reported to Dr. Demby that his understanding from his mother is that his father is trying to take J. away from her. He also reported that his mother has asked him to keep secrets from his father, but his father has never asked him to keep secrets from his mother. All of this causes J. to experience himself as caught in the middle of his parents’ conflict, which is a source of anxiety for him. He has attention issues and learning problems which cause him to perform below grade level in reading and language. He is not aggressive and does not have a behavior management problem in school, but because of his attention issues, he cannot work independently and sometimes needs to be redirected. J. has often had inappropriate outbursts and behavior problems when at appointments with his pediatrician and dentist. His pediatrician discussed limit-setting and discipline with Ms. R. J. followed instructions better when he was with the father than he did when he was with the mother. A shared or equal custody schedule is problematic for a child with learning disabilities. Given J.’s history of learning disabilities and attention issues, it would be beneficial for him to have a home base, rather than dividing his time equally between his parents’ homes.
Ms. R. has serious parenting deficiencies, which stem from personality problems that get in the way of her creating more stability for herself and her children. She portrays herself in an unrealistically positive light, as having no psychological problems and as being far more self-sufficient and self-assured than she actually is. She blames those problems she does acknowledge on other people, rather than taking responsibility for them. One result of these characteristics is that she tends to make impulsive and often irrational decisions that make her life — and the lives of her children — chronically unpredictable, crisis-prone, and chaotic. These characteristics are likely to persist, as they are not easily modified by therapy, and require at a minimum, long-term therapy. Ms. R. has never engaged in intensive or consistent therapy.
As a parent, Ms. R. is excessively permissive, and has problems with limits and boundaries. She has not made any real changes based on Dr. Winter’s suggestions that she be more assertive and less permissive. When problems arose, Ms. R. was often unable to focus her thoughts, became overwhelmed and could not move into action, causing her to be unable to cope *533 with stress. Her passivity and lack of focus were often exacerbated by her unrealistic expectations, wishful thinking, and tendency to blame others rather than to act. One example of this is her failure to seek child support from A.’s father until after this action began, although she had not received child support from him for a long time.
Ms. R is warm, loving and kind. She plays and laughs with J., who experiences her as loving and caring about him. She has made some sound educational and medical decisions about J. in the past, although she has often not followed through. She has done a good job so far of choosing extracurricular activities for J.
Although Ms. R is affectionate with J., she does not understand the complexity of J.’s emotions and is not psychologically attuned to J.’s needs. Significant examples of this include her telling J. to keep secrets from his father, telling J. that his father is trying to take him away, and complaining about Mr. D. to J. This conduct burdens J., places him in a bind, and is likely to make him anxious and frightened. Ms. R. does not credit Mr. D. with playing any role in J.’s academic and behavioral progress in the last year, even though it is clear that he has done so.
Mr. D. is gruff, emotionally detached and rigid. Although he clearly loves J., he is neither warm nor affectionate. He is prone to outbursts of anger. He is not empathetic toward J., and does not understand him emotionally. He often yells at J., believing that it is the best way to get his attention. He is extremely hostile toward Ms. R., and could not name one positive trait that she possesses as a parent. He thinks she is a “loser,” and irrational, vindictive, vicious, manipulative and untruthful. He has screamed at her and called her derogatory names in front of J. Mr. D. does not have a thoughtful understanding of J.’s learning difficulties, and believes J. just has to work harder. He has also not educated himself about J.’s condition. Nonetheless, the father has responded to the suggestions and recommendations of professionals concerning J.’s needs, leading him to find appropriate assistance for J. in the form of tutors and an appropriate evaluation. In addition, together with Ms. M., he has created a stable and predictable home for J.
Dr. Demby concluded that the risks for J. in remaining with the mother are greater than the risks for J. in changing primary custody to the father. Dr. Demby noted that one of the most important factors that led to his conclusion is the instability in the mother’s life and in her home, caused by her wishful think *534 ing, denial and lack of assertiveness, and the grave risk that there will be an adverse cumulative effect on J.
Analysis
Each of these parents wants primary custody of J. Ms. R. wants to make all final decisions, to have J. live primarily with her, and to have Mr. D. see him only on alternate weekends, from Friday to Sunday night, and one evening during the week. This would be a notable decrease from the current five overnights that J. spends with his father in every two-week period. Mr. D. has adopted Dr. Demby’s parenting recommendations, with the following exceptions: (1) the father’s proposal decreases the disproportionate allocation of vacations to Ms. R.; (2) under the father’s proposal, he, rather than Ms. R., would have final decision-making authority with respect to J.’s education and mental health; and (3) neither party would have the primary right to make decisions about religion, although the father, who was raised Catholic but is not particularly religious himself, is not opposed to J. participating in Jewish holiday celebrations, as he has done in the past with both parents.
Neither Dr. Demby nor Mr. D. proposes that either parent have sole custody. I agree with that approach in this case. Each of these parents has serious parenting deficiencies. Ms. R. is too permissive and too disorganized to create the stable structured environment that J. needs in order to overcome his learning limitations. She does not have appropriate boundaries, as demonstrated by her actions of repeatedly speaking to J.’s teachers about her personal problems even after being asked not to do so, bringing J. along to her therapy sessions and A.’s hypnosis sessions, and talking to J. inappropriately about his father. Mr. D. is not warm, affectionate or empathetic and does not understand J. emotionally. Neither of these parents is a better parent than the other to the degree that either of them should be privileged over the other as the custodial parent.
It would also not be appropriate to award these parents joint custody. Joint custody is not appropriate where the parties are hostile and cannot communicate (Braiman v Braiman, 44 NY2d 584 [1978]; Matter of Fedash v Neilsen, 211 AD2d 1003 [3d Dept 1995]). Unfortunately, these parties do not communicate well. They have each disparaged the other in front of J., and Ms. R. has continued to complain about Mr. D. directly to J.
Therefore, the court will set a schedule for J. to spend time with each parent and a procedure for making decisions for J.’s *535 benefit that will (1) minimize the parties’ contact with each other; (2) give J. the benefit of each parent’s strengths; and (3) minimize his exposure to their weaknesses.
Parenting Schedule
In view of the father’s greater ability to provide structure to J.’s life and J.’s close and loving relationship with his mother, the court is setting a schedule under which J. will live primarily with his father during the school year, and primarily with his mother during the summer and other school break periods. Specifically, during the school year, J. shall live primarily with his father, and shall be with his mother: (1) every Thursday, from after school until drop-off at school on Friday morning, and (2) on alternate weekends, from Friday after school until drop-off at school on Monday morning. If the Monday following J.’s weekend with his mother is a school holiday, he shall remain with her until she takes him to school on Tuesday morning. This visitation schedule shall be reversed during J.’s summer break, so that J. spends Thursday overnights and alternate long weekends with his father and the balance of time with his mother. J. shall also spend two weeks with each parent each summer, apart from the reversed school year schedule described above. The mother shall have the first choice of weeks in odd-numbered years and the father shall have the first choice in even-numbered years. The parent with the first choice shall advise the other parent of his or her chosen period by April 1 of each year. If he or she fails to do so, the other parent may choose, and shall notify the other parent by April 5 of the dates selected. The parent who makes the second choice shall notify the other parent of the dates he or she selects as soon as possible, but in no event later than April 15. For 2011 only, however, the mother shall notify the father of the dates of her two-week summer vacation with J. by June 10, 2011, and the father shall notify the mother of the dates of his two-week summer vacation with J. by June 20, 2011.
The court recognizes that this schedule will result in J. spending less time than he is accustomed to with his mother. In recognition of that, the court will set a schedule under which J. will spend more of his holiday time with his mother. Specifically, J. will spend midwinter break each year with his mother; he shall spend Thanksgiving and Christmas alternately with each parent; he shall spend spring break with the parent with whom he spent Thanksgiving in that school year; and there will be adjustments so that J. will spend religious holidays with the parent who celebrates those holidays. To accomplish this:
*536 1. In odd-numbered years, J. shall spend Thanksgiving, from Wednesday after school to Monday morning, and the midwinter break, from the afternoon of the last day of school before the break to the morning of the first day of school after the break, with his mother, and he shall spend spring break and the winter break, from the afternoon of the last day before the break to the first morning of school after the break, with his father. However, if Passover falls during spring break in an odd-numbered year, then J. shall spend the spring break with his mother, and midwinter break with his father that year.
2. In even-numbered years, J. shall spend Thanksgiving with his father, and he shall spend the winter, midwinter, and spring breaks with his mother.
3. To the extent that J. would otherwise be with his mother from December 24 to 26 under the above schedule, J. shall celebrate Christmas with his father from 6:00 p.m. on December 24 to 11:00 a.m. on December 26. To the extent that J. would otherwise be with his mother under the above schedule for Easter, J. shall celebrate Easter with his father from 10:00 a.m. on Easter Sunday to the following Monday, with drop-off at school, or at the mother’s home at 9:00 p.m. on Easter Sunday.
4. In addition, to the extent that J. would otherwise be with his father under the above schedule, he shall be with his mother for the following holidays: Rosh Hashanah, from after school on the night before Rosh Hashanah if it is a school day, or at 5:00 p.m. if it is not, to the day after Rosh Hashanah, drop-off at school if that is a school day, or at 11:00 a.m. at the father’s home if it is not; Yom Kippur, from after school on the night before Yom Kippur if it is a school day, or at 4:00 p.m. if it is not, to the day after Yom Kippur, drop-off at school if that is a school day, or at 11:00 a.m. at the father’s home if it is not; and the first night of Chanukah, from after school, or 5:00 p.m. if that is not a school day, to the following morning drop-off at school, or 11:00 a.m. drop-off at the father’s home if that is not a school day.
For any transitions that do not occur at school, the mother shall be responsible for picking up and dropping off J. from his father’s home during the school year, and the father shall be responsible for pick-ups and drop-offs from the mother’s home during the summer.
When either parent spends time outside of New York City with J., as soon as practicable before leaving New York with J., he and she shall notify the other parent of J.’s travel itinerary, *537 including flight information, the address where J. will stay, and a telephone number where he can be reached.
The mother shall organize an event for J.’s birthday in odd-numbered years, and the father shall do so in even-numbered years. Each shall invite the other to the celebration.
The parent who J. is not with may call him between 7:00 p.m. and 8:00 p.m. each night. J. may call either parent at any time.
This schedule shall be effective commencing with the day after the end of school in 2011.
This schedule accomplishes several things. Although it will decrease the time that J. will be with his half sister, A., during the school year, he will still spend 5 nights out of 14 with her, and, at the same time, he will spend more time with his other half sister, E It will also protect J. from the mother’s bad judgment, as evidenced by, for example, her continuing to spend time with Mr. G., and from her lack of structure and organization, as evidenced by, for example, her inability to get J. to school on time. In setting this schedule, I am hopeful that Ms. R. will be able to organize herself to get J. to school on time on Fridays and alternate Mondays. It will also give J. the benefit, during the school year, of the calmer, more stable and consistent atmosphere at the home that Mr. D. shares with Ms. M. Any interruption in the father’s continuing to share a home with Ms. M. would constitute a substantial change in circumstances warranting reconsideration of this schedule, as would the mother’s failure to get J. to school on time on the mornings that he is with her.
Decision Making
The court has low expectations of both parents’ abilities to communicate effectively with each other and to make decisions jointly. Therefore, the court will not direct the parties to use a parenting coordinator, mindful that constant consultation is only likely to exacerbate the differences between parties such as these (see e.g. Bliss v Ach, 86 AD2d 575 [1st Dept 1982], affd 56 NY2d 995 [1982]). Instead, given that each parent has shown strengths in decision making for J. in different areas, as well as the considerable level of acrimony between the parties, it is appropriate for the court to define subject areas, or “spheres,” in which each party will be the final decision maker (see Matter of Ring v Ring, 15 AD3d 406 [2d Dept 2005]; Wideman v Wideman, 38 AD3d 1318 [4th Dept 2007]; C.C.W. v J.S.W., 15 Misc 3d 1140[A], 2006 NY Slip Op 52593[U] [Sup Ct, Monroe County *538 2006]). For any major decision within each parent’s “sphere,” the parent shall advise the other of any major approaching decision, the time frame in which it must be decided, and the parent’s proposed decision. The other parent shall have the opportunity to comment and provide alternatives. However, the decision of the designated parent shall be final. The parents shall have the following areas of decision making:
Mr. D.: education and medical, including mental health. However, both parents shall have the right to speak to J.’s educational, medical and mental health providers, to obtain J.’s educational and medical records that are not otherwise privileged, and to attend all events at J.’s school, including parent-teacher nights, school fairs, and school performances.
Ms. R: summer camp or activity, extracurricular activities, and religion. However, extracurricular activities and religious instruction, if any, shall be scheduled so that they do not interfere with the father’s time with J. on weekends or during school breaks, unless the father agrees otherwise. Notwithstanding Ms. R.’s right to make decisions about J.’s religion, Mr. D. shall have the right to celebrate Christmas and Easter with J. and to take J. to family celebrations of Christian holidays and/or family celebrations that take place in a church.
Medical and mental health appointments shall take priority over extracurricular activities, but shall be scheduled, to the extent possible, so as not to interfere with either school or ongoing extracurricular activities. Mr. D. shall arrange forthwith for J. to be in individual therapy to assist J. in adapting to the new parenting schedule.
The decision-making allocation set forth above is based on the following considerations. Although Ms. R. made many sound educational decisions in the past, including obtaining a SEIT for J. and placing J. in a CTT class, she has more recently and increasingly failed to follow through on important educational issues. She failed to organize herself to get J. to school on time for the early morning sessions, starting in kindergarten, frequently got him to school late, and often picked him up late or botched the arrangements for him to get home from school. More recently, she failed to arrange a tutor or an evaluation in a timely way, and she has failed to schedule regular appointments with the tutor whom Mr. D. hired. Although Mr. D. has expressed some skepticism about tutoring and J.’s need for special education services, he has in fact followed the recommendations of professionals and has taken serious steps to address J.’s issues.
*539 Similarly, although Ms. R. made some sound medical decisions for J. early on, such as recognizing and addressing his speech impediment and balance problems, she has also shown a distressing inability to address other issues in a thoughtful way, including failing to get dental care for J. until he was five years old. She also has handled A.’s medical problems in a haphazard manner. She has also shown poor judgment by, for example, taking J. to her own therapy sessions and to A.’s therapy sessions. She also failed to follow Dr. Winter’s recommendation that she be in therapy. Conversely, although Mr. D. was passive about J.’s medical care when he was younger, he has become more involved. He will, however, have to educate himself about J.’s health and actively follow up on any medical issues that may arise. I have also considered that, in light of J.’s learning problems, there may be significant overlap between educational, medical and mental health issues, so that it is most sensible to put one parent in charge of both educational and medical decision making.
On the other hand, it would be a mistake to deprive Ms. R. of any decision-making role in J.’s life. She has always done a fine job of finding appropriate recreational activities for him, and she should continue to have the responsibility for that area. In addition, the mother has always celebrated the Jewish holidays with J. and the father has never objected to this. At the same time, the father describes himself as not particularly religious. Therefore, it is appropriate that Ms. R. have control over religious issues.
It would be beneficial for both of these parents to engage in individual psychotherapy, but I am skeptical of the effectiveness of court-ordered therapy, so I will not order it. However, for J.’s sake, I urge them both to engage in therapy, in the hope that it will assist them in becoming the best parents for J. that they can be.
Neither of these parents has the skills or qualities necessary to be J.’s sole custodian. Nor do they have the communication skills essential to joint custody. To the extent that any issue (such as choice of school or obtaining a passport) requires that J. have a custodial parent, I hold that each of them has custodial rights, consistent with this decision. Essentially, they have parallel custody of J.
The parties and their counsel are directed to appear for a status conference in Part 24 on July 1, 2011 at 9:30 a.m. to discuss the financial implications of this decision.
*540 Counsel are directed to settle a custody order on notice that is consistent with this decision within 60 days of the date of this decision.

. I find that Mr. D. exaggerated, and Ms. R. understated, the amount of time that he spent with J.

. The court does not credit the mother’s testimony that Mr. D. refused to let her get a tutor and insisted that she teach J. instead.