▆ In the Matter of MICHAEL B., Respondent. LILLIAN B., Appellant. [42 NYS3d 141]—

---

Order, Family Court, New York County (Adetokunbo O. Fasanya, J.), entered on or about August 31, 2015, which, after a hearing, awarded sole legal and primary physical custody of the parties' child to petitioner father, with liberal parenting time to respondent mother, unanimously reversed, on the facts and in the exercise of discretion, without costs, and primary physical and sole legal custody awarded to the mother, with parenting time awarded to the father. Family Court shall enter an order within 30 days encompassing the provisions set forth below.

This is the unusual case where we should exercise our authority to reverse a custody determination by the trial court (*Matter of Louise E.S. v W. Stephen S.*, 64 NY2d 946, 947 [1985]). The Family Court Judge presiding over the trial of this complex and long-running custody matter was clearly concerned with the child's best interests and wrestled with concerns about the mother's history of mental health issues, and the effect on the child of a "temporary" award of custody to the father, issued years prior to assignment of the case to the trial judge. However, a thorough review of the record does not provide a sound and substantial basis for the award of custody to the father, and requires an award of custody to the mother.

The mother and father, who have never been married or resided together, have a child together, B.B., born in October 2007. For the first three years of her life, B.B. lived with her mother. The father was not present when B.B. was born, did not visit her at all for the first six months of her life and had limited contact with her thereafter. In or about fall 2010, when the mother was pregnant with her youngest child, she stopped taking her psychiatric medication. As a result, she was hospitalized in November 2010. During her hospitalization, the father obtained an order giving him temporary custody of B.B. and requiring that the mother's parenting time be supervised. This temporary order remained in place for nearly five years.

It is undisputed that, since the father was granted temporary custody, the paternal grandmother has acted as B.B.'s primary caretaker during the father's parenting time. The father has been only tangentially involved in B.B.'s day to day care, sometimes dropping her off at, or picking her up from, school, or taking her to doctor appointments. His primary involvement was in enrolling her in school and providing for her material needs. While the father has adequately provided for her financially, and the paternal grandmother capably ensured

that B.B. was fed and clothed, their relationship with B.B. is not warm or affectionate.

Upon the mother's discharge from the hospital in December 2010, she and B.B.'s older half sister and two younger half brothers went to live with the mother's sister in New Haven, Connecticut, where the mother's parents and four of her five siblings reside. In 2012, the mother obtained her own apartment in New Haven, where she continues to reside with her other three children.

Starting immediately after her discharge from the hospital, the mother regularly visited with B.B. From May 2011 until the time of trial, B.B. spent every weekend with her mother. In addition, in winter 2011 and 2013, B.B. spent either Thanksgiving or Christmas and part of her winter school break, and the majority of the summers in 2013 and 2014, with her mother and siblings in Connecticut. The mother attended B.B.'s graduation from kindergarten in 2013 and from the first grade in 2014, in New York City, and met her teachers. While following the requirement in effect until January 2015 that an adult family member be present, the mother provided the care for B.B. and her siblings during her parenting time.

On January 16, 2015, immediately after hearing the mother's testimony at trial, the Family Court terminated the temporary order's requirement that the mother's parenting time be supervised, and instead provided that a family member be present only at the exchanges of B.B., and that the child's attorney be permitted to communicate with the mother's mental health treatment providers to ensure that she remained compliant with treatment.

It is undisputed that the mother is an excellent, warm and responsive parent, as the father himself testified. The neutral forensic evaluator, Dr. Mark Rand, Ph.D., M.P.H., found that the child has an "attachment" with her father, which "grows out of routine involvement," as well as family connection and love, but is not of the same quality as the rich emotional bond she has with her mother. He concluded that the child's bond with her mother is "such that it would foster emotional growth of the child, maturity, a good feeling about herself and connectedness with others, while the relationship that she has with her father and paternal grandmother would fail in nurturing this child's emotional development nearly to the same degree." Dr. Rand also determined that the mother is the parent best able to foster the child's relationship with her siblings and with her father. He concluded that the child would be "significantly happier" living with her mother.

The child was below grade level in all of her academic subjects. Dr. Rand determined that neither the father nor the paternal grandmother understood either the grading system at B.B.'s school or the academic expectations for children B.B.'s age. He determined that the mother did understand the grading system, and that she "is more attuned and more skilled at promoting the school development of the child in a manner appropriate to the school level that the child is in."

The Family Court heard testimony over 18 days between November 18, 2013 and January 16, 2015, and held an in camera interview with the child. On August 31, 2015, the Family Court issued its custody order after trial, which awarded primary physical and sole legal custody to the father and visitation to the mother, eliminating the requirement that a family member be present at exchanges.

In its award of custody to the father, the Family Court erred in several respects. First, it gave substantial weight to the fact that the father had temporary custody of the child for four years and nine months. This fact should not have been a basis, without more, for a final custody award. A temporary award, especially one issued ex parte as this one was, is not given the same weight as an award of custody after trial, since a temporary award is not based on "consideration of all relevant evidence introduced during a plenary trial" (*Friederwitzer v Friederwitzer*, 55 NY2d 89, 94-95 [1982]). Moreover, "stability is important but the disruption of change is not necessarily determinative" (*Friederwitzer*, 55 NY2d at 94, citing *Matter of Nehra v Uhlar*, 43 NY2d 242, 248, 250 [1977]). Here, the child spent more time with her mother during her mother's parenting time than she did with her father during his, and the child remained more strongly emotionally bonded to her mother throughout the nearly five years that the father had temporary custody. Under these circumstances, any "stability" for the child from leaving the temporary arrangement in place is negligible and is far outweighed by the other custody factors, all of which favor awarding custody to the mother.

Secondly, the Family Court gave excessive weight to the parties' financial circumstances, noting that their finances favored the father because the father works, and the mother is unemployed and receives Supplemental Security Income (SSI). However, "[w]hile concerns such as the financial status and the ability of each parent to provide for the child should not be overlooked by the court, an equally valid concern is the ability of each parent to provide for the child's emotional and intellectual development" (*Eschbach v Eschbach*, 56 NY2d 167, 172

[1982]). Here, the mother is far more capable of meeting the child's emotional and intellectual needs than is the father.

Third, there is no support for the Family Court's finding that the neutral forensic evaluator "made an initial superficial assessment of the parties at the commencement of his evaluative process, cast his lot with [the mother], and worked from that point to present his findings in her favor." In addition to meeting with each parent on more than 10 occasions, with the child at least six times, and with extended family members, Dr. Rand spoke with the mother's therapist, and reviewed the mother's psychiatric records. In his 52-page initial report, his 39-page updated report, and in his testimony, Dr. Rand carefully evaluated and weighed the parties' strengths and weaknesses as parents, and concluded that "the mother's psychiatric history does not present a risk factor for the child's optimal development that would outweigh the negative factors in the home of the father and the paternal grandmother."

Fourth, Family Court's concern about the mother's mental health history is understandable, but its conclusions disregard crucial evidence and its determination is not in the child's best interests. In March 2015, when the trial was completed, the mother was in remission, had not been hospitalized since November 2010, and, in the five years since then, had been compliant with treatment by her psychiatrist and therapist. In addition, it is undisputed that the mother had custody of her three other children throughout the litigation, and there was no evidence that she was unable to care for them. Although certainly relevant, a parent's mental health is not determinative of custody (*Moor v Moor*, 75 AD3d 675, 678 [3d Dept 2010]). Particularly where, as here, a parent seeks appropriate treatment for a mental health condition, and there is no evidence that he or she is presently unable to care for the child, a history of mental illness does not preclude an award of custody (*Sendor v Sendor*, 93 AD3d 586, 587 [1st Dept 2012]). Family Court's focus on the possibility that the mother may experience a relapse was speculative and not supported by the record, and thus an inappropriate basis for its custody determination (*Matter of Lawrence C. v Anthea P.*, 79 AD3d 577, 579 [1st Dept 2010]).

Moreover, Dr. Rand determined that, should her symptoms recur, the mother is not at risk of acting out in an aggressive or suicidal manner; rather, "there would be a risk of her isolating herself somewhat and her getting depressed." He also found that she had good insight into her condition, that her treatment was important to her, and that she was compliant with

treatment. In addition, the mother has a supportive bond with her close-knit extended family who live near her in Connecticut, and, in particular, with her mother, whom the mother saw even more frequently than Dr. Rand recommended would be optimal to support the mother's mental health and mitigate any risk to B.B. in the event of a recurrence of the mother's symptoms. The maternal grandmother testified that she was able to reach the mother's therapist and psychiatrist, and that if she believed any of her grandchildren were in danger, she would do so.

Fifth, B.B.'s close relationship to her siblings, all of whom reside with her mother, also weighs in favor of awarding custody to the mother, since "the stability and companionship to be gained from keeping the children together is an important factor for the court to consider" in making a custody determination (*Eschbach*, 56 NY2d at 173), because "[y]oung brothers and sisters need each other's strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful" (*Obey v Degling*, 37 NY2d 768, 771 [1975]).

Finally, Family Court improperly considered this a relocation case, governed by *Matter of Tropea v Tropea* (87 NY2d 727, 740-741 [1996]). However, since there has been no prior custody order, *Tropea* does not govern, and relocation should have been considered as one factor in determining the child's best interests (*Matter of Quistorf v Levesque*, 117 AD3d 1456, 1456-1457 [4th Dept 2014]). Even if this Court were to consider the *Tropea* factors, they would still weigh in favor of awarding custody to the mother. Significantly, as the Family Court found, the distance between the parties' homes is not great. Furthermore, the father spends time with B.B. only a few hours each week during his parenting time. Since the mother has had weekend visits since 2011 and summer visits since 2013, the father has generally spent little leisure time with B.B. Accordingly, a regular schedule of alternate weekend and midweek dinner parenting time, and telephone and/or Internet communication, would permit at least as much contact between the father and the child as currently exists.

Joint legal custody is not appropriate where, as here, the parties' relationship is characterized by acrimony and mistrust (*Lubit v Lubit*, 65 AD3d 954 [1st Dept 2009], *lv denied* 13 NY3d 716 [2010], *cert denied* 560 US 940 [2010]).

Consideration of every applicable factor, in the totality of the circumstances of this case (*Eschbach*, 56 NY2d at 171-173; *Friederwitzer*, 55 NY2d at 93-94), and in particular the

"primary" factors of "ability to provide for the child's emotional and intellectual development, [and] the quality of the home environment and the parental guidance provided" (*Matter of Louise E.S.*, 64 NY2d at 947; *see also Eschbach*, 56 NY2d at 172-173), leads to the conclusion that an award of custody to the mother is in the child's best interests, and an award of custody to the father, which is essentially an award of physical custody to the paternal grandmother, is antagonistic to the child's best interests.

Accordingly, we direct the Family Court to enter an order within 30 days encompassing the following provisions:

Commencing immediately at the end of the current school semester, the mother shall have primary physical custody of B.B., with access by the mother until then as set out in the Family Court's decision and order after trial. In addition, the mother shall have sole legal custody, and she shall be directed to advise the father at least one week in advance of all major decisions about B.B.'s health and education. In the event of an emergency affecting B.B., the parent who is with B.B. at the time shall notify the other parent as soon as possible.

The father shall have the right to communicate with, and obtain records from, the child's educational and medical providers, and shall be entitled to attend all of B.B.'s school events to which parents are invited.

Commencing with the end of the current school semester, the father shall have parenting time with B.B. every Wednesday from 4:00 to 7:00 p.m. in New Haven, and on alternate weekends from 4:00 p.m. on Friday to Sunday at 5:00 p.m.

The holiday schedule, which shall supersede the regular parenting time schedule above, shall be as follows: (1) the parties shall split B.B.'s winter school break, with the mother having B.B. with her for Christmas Day in odd years, and the father in even years; and (2) each parent shall be entitled to have B.B. with him or her for two weeks during her summer school break, provided that the father give the mother notice each year by April 1 of the dates, and the mother give the father notice each year by May 1 of the dates.

The father shall pick B.B. up from the mother's residence or school, and shall drop her off curbside at the mother's residence for all visits. Concur—Mazzarelli, J.P., Acosta, Saxe, Moskowitz and Gesmer, JJ.