OPINION OF THE COURT
Matthew F. Cooper, J.
One of the more encouraging developments that I have *977 observed as a judge sitting in a Matrimonial Part in New York County is an increased willingness on the part of divorcing parents to attempt to work together to cooperatively raise their children. And even if real cooperation is not possible, there is often recognition by the parties and their attorneys that provisions should be made to allow both parents to participate in the child’s upbringing to the greatest extent possible.
This trend towards the inclusion of both parents in the parenting process might be attributable to the changing views of what it means to be a parent—with fatherhood no longer relegated to an Inferior position to motherhood. Or it might be reflective of what has become the almost universally held belief that children are generally disserved by having either parent—be it a mother or a father—playing only a peripheral role in their young lives.
Whatever the reason, the result is that the vast majority of custody disputes that come before me are ultimately resolved without a trial by the parties agreeing to a parenting plan. In almost every instance, the parenting plan provides for some form of shared decision-making. This arrangement, which is commonly referred to as “joint custody” or “joint legal custody,” enables both parents to have a real say as to what happens in their child’s life.
In its purest form, shared decision-making calls for all major decisions to be made collectively by both parents. In other instances, each parent is assigned specific areas—often referred to as zones or spheres—where he or she has final decision-making authority. And then there are hybrid provisions, which, for instance, call for decisions to be made jointly but allow a third-party professional, such as a parent coordinator, educational consultant, or pediatrician, to cast the deciding vote in case of a parental deadlock.
There are, of course, situations where shared decision-making, no matter the form, is neither possible nor desirable. These include cases where a parent lacks basic parenting skills, where there has been unacceptable conduct such as domestic violence, or where there is untreated alcoholism or other substance abuse. The presence of mental illness or personality disorders, depending on the type and severity, might also prove to be an impediment to co-parenting, as would a parent’s failure to demonstrate the necessary level of commitment or ability to do what is best for the child. A child’s mental or physical disability, poverty or financial stress, or a parent living far *978 from where the child resides are additional factors that can play a role in determining whether co-parenting will ultimately be workable. If one or more of these factors are present, vesting decision-making in one parent may be the only option to promote and protect the child’s best interest.
This is a custody dispute that one would think could readily be resolved by the parties agreeing to a form of shared decision-making. None of the factors that militate against co-parenting are present. In almost all respects, the situation appears ideal for it to work. For example, both parties are intelligent, educated, involved, loving parents, each of whom has more than adequate parenting skills. Their child is a healthy and well-adjusted 10-year-old boy who is happy at the prestigious private school he attends, and although more closely bonded with the mother, certainly wants the father to be part of his life. Both parents’ households are located in close proximity to each other, and there are more than ample financial resources with which to pay for family therapists, parent coordinators and other professionals to assist in the process.
Despite all the factors favoring a co-parenting arrangement, there is one flaw, at least from the mother’s perspective, that calls into question whether shared decision-making is feasible in this instance: the father’s vexatious personality. According to the mother—and others in the father’s professional and personal life—he can be argumentative, contentious and rigid. It is the mother’s position that because the father can be so difficult to co-parent with, she should be awarded sole decision-making authority over all spheres, and by implication, be deemed to have sole custody of their child. The father, while conceding that joint decision-making is not viable, argues that he and the mother should each have final decision-making authority over specified zones, and by implication, they both should be deemed to have joint custody of their son.[1]
The key issues to be determined in this posttrial decision are whether it is in the child’s best interests to vest all final decision-making authority with the mother, and, in effect, make her the sole custodial parent. There is also a secondary issue as to whether the father’s parenting time with the child should be modified from what it has been since the parties’ separation more than 2V2 years ago.
*979 I, Background and Trial Testimony
The parties were married in 1999. Their only child, a son, was born in 2007. Although the parties, both of whom received an MBA at Wharton, attained great professional success and together lived a privileged Manhattan lifestyle, they never seemed to have enjoyed being married to one another. The tensions in the relationship only intensified after the birth of the child in 2007, and neither marital therapy, nor the services of a parent coordinator, proved to be helpful. In 2013, the father revealed he had been engaged in another relationship and that he was seeking a different type of life than the one he could have with the mother. After this announcement, the parties decided to separate.
In January 2014, the father commenced this divorce action. In September 2014, the parties entered into an agreement setting forth an interim parental access schedule. Shortly thereafter, the father moved to his own apartment. For the next two years, the parties attempted to agree on a parenting plan. There were countless settlement conferences, both in court and out, and numerous draft agreements exchanged and redlined. Unfortunately, this effort was to no avail, and the parties were unable to reach a compromise.
Notably however, there have been relatively few problems with either the interim access schedule or decision-making during the course of this litigation. In fact, the only disputes that I am aware of concerned which sports programs the child was going to be enrolled in and how many weeks he would attend summer day camp. There have been no problems with the child’s education, as he is thriving at a school that he will be able to attend through 12th grade, and there are no issues concerning his medical care, as he is doing well under the care of a mutually agreed-upon pediatrician and child therapist. In short, the parents, while fixating on relatively inconsequential matters in their child’s life, have somehow managed, despite their differences, to successfully raise him to this point.
The trial that ensued took place over a number of days in the late summer and fall of 2016, with posttrial briefs submitted at the end of the year. The witnesses were the parties, the person who briefly served as a parent coordinator and later as a consultant to the father, and the psychiatrist appointed by the court to conduct the forensic custody evaluation. Following the conclusion of testimony, I met with the child, accompanied *980 by the Attorney for the Child, in an in camera proceeding known as a Lincoln hearing.[2]
The key witness was the forensic psychiatrist. In his forensic report, prepared in the fall of 2015, and in his testimony, he provided examples of the father’s rigidity and idiosyncracies, and articulated how making decisions jointly would be an ordeal for the mother because of the father’s difficult, often combative, personality. The forensic psychiatrist, however, was clear that both parents possess the “basic skills and knowledge to be more than competent parents,” and that, although the father was “rigid about his beliefs,” his “parenting skills are nevertheless well within the range of normal.”
Although the forensic psychiatrist largely focused on the father’s various personality deficiencies, he identified flaws on the part of the mother as well. For instance, he pointed out that, at times, she too can be rigid, has a tendency to be “somewhat overprotective” of the child, and is “angry and resentful” towards the father. Nevertheless, he concluded that because the mother is more sensitive to the child’s needs, more able to give consideration to the other parent’s views, and because the parents cannot “work together,” the mother should have final decision-making authority in all areas. In his report, he did not address the question of zones of decision-making, but in his testimony he stated that while employing zones might “incen-tivize” both sides to be inclusive in the decision-making process and prevent a parent from being marginalized, he felt that it would give rise to problems because “one could be handled in radically different ways than the other” and because decisions do not always fall neatly into one zone or another.
The former parent coordinator testified as a witness for the father. He was apparently called to express his view that the parent coordination process would have worked had the mother been willing to continue with it and had she been less angry with the father. The testimony was of limited value in that the parent coordinator was clearly aligned with the father, whom he later worked with on an individual basis without notifying the mother. He also admitted on cross-examination that during the eight months he worked with the parties, the father, at times, lost his temper and exhibited disrespect for the mother.
*981 Both parents testified on their own behalf. Predictably, they each sought to blame the other for their inability to work together. The mother focused on how contentious and uncompromising the father could be and just how exhausting it was trying to make a decision with him. She introduced the father’s employment evaluations to show that the people he worked with had the same problems dealing with him that she did.[3] And she stressed that the father’s rigidity and idiosyncratic tendencies—which included a wide array of food-related beliefs and a strict adherence to rules and schedules—impacted negatively on his relationship with the child.
The father, in turn, attempted to attribute the parenting problems to the mother’s anger and dislike of him, and what he saw as her willingness to give in to the child’s wishes rather than exert appropriate parental authority. On a more positive note, he acknowledged that he had become increasingly aware of how difficult he could be to deal with, and explained that he was working with a therapist to address the less attractive aspects of his personality.
The odd thing about the parties’ testimony—and that of the other witnesses—is that despite the fixation on how these parents cannot co-parent, and the mother’s difficulty dealing with the father, the evidence shows that when needed, the parties have somehow managed to collectively make major parenting decisions for their child, such as education and medical treatment. What they have been unable to do is make the minor parenting decisions. As a result, the custody trial featured hours upon hours of testimony concerning disputes over relatively trivial matters such as whether the child would be enrolled in soccer or baseball, whether it was safe to play touch football, and whether the child should go to day camp for four or six weeks.
II. Discussion
The same way that the arrangements by which divorced parents raise their children have changed over recent years, the language employed to describe those arrangements has begun to change as well. The terms “legal custody,” “physical custody,” and “visitation”—all deeply ingrained components of *982 the process by which we determine what role each parent will play in the child’s life—are gradually giving way to new terms. These new terms are reflective of the greater emphasis that is now being placed on co-parenting.
A. Legal Custody and Decision-Making
The word “custody” itself—whether in the context of legal custody or physical custody—is fraught with implications. Because the word is defined as the “care and control” of another, the granting of custody to one parent can be seen as a declaration that the other parent has no role, or at best, a decidedly secondary role, in raising the child. Thus, it makes sense, wherever possible, to avoid using the word in favor of more neutral terms that do not give rise to the negative associations that come with being designated the noncustodial parent. This is why many family law attorneys now craft parenting agreements without using perceivably divisive labels. Instead, they merely set forth the agreed upon method by which the parties will make parental decisions for their child. Alternatively, parenting agreements that do contain a custodial designation almost always provide for the parents to have joint custody, even in cases where there is little expectation that the parties will work together cooperatively or engage in real shared decision-making. This reflects the recognition that joint custody is basically just a title, as are all custodial designations, with decision-making being the mechanism that actually guides the parenting process.
So far, courts, when determining custody matters, have been slow to join practitioners in jettisoning the traditional custody-centric model in favor of one that is centered on decision-making. This is evidenced by a series of recent Appellate Division decisions, all of which treat parental decision-making as a function that is tied to legal custody, as opposed to one that, in and of itself, constitutes the method by which parents will raise their children. In some of these decisions, parental decision-making is viewed as being subsumed within the context of legal custody (see e.g. Phillips v Phillips, 146 AD3d 719, 719 [1st Dept 2017] [awarding “sole legal and physical custody” to mother; no mention of decision-making]; Matter of Dayvon G. [Amber B.], 146 AD3d 414, 414 [1st Dept 2017] [“sole legal and physical custody” to mother; no mention of decision-making]; Karlsson v Karlsson, 145 AD3d 639, 639 [1st Dept 2016] [“sole legal and primary physical custody” to mother; no mention of decision-making]; Matter of Michael B. [Lillian B.], *983 145 AD3d 425, 431 [1st Dept 2016] [“primary physical custody” and “sole legal custody” to mother; no mention of decision-making]). In others, it is seen as being incidental to it (see e.g. Douglas H. v C. Louise H., 138 AD3d 497, 497 [1st Dept 2016] [awarding “sole custody and decision-making authority” to father]; Matter of Carlos S. v Ana S., 137 AD3d 700, 700 [1st Dept 2016] [“sole custody and decision-making authority” to father]; Tatum v Simmons, 133 AD3d 550, 551 [1st Dept 2015] [“shared legal custody of the child with each party having final authority over separate decision-making zones”]).
I foresee a time when judges who are called upon to determine parenting issues will be able to proceed directly to deciding decision-making without having to make unnecessary, and sometimes detrimental, custodial designations. But, in light of current appellate case authority, it seems that such a time has not yet arrived. Accordingly, in addition to determining how the parties will handle decision-making, I will decide what form legal custody will take. In particular, I will determine if the custodial designation should be joint custody to both parties or sole custody to the mother.
Nationally, joint custody is increasingly becoming the favored custodial designation. Statutes in 18 states and the District of Columbia create a presumption that joint custody is in the best interests of the child, and those in three other states list it as the preferred option. Not only does New York not have a statutory presumption or preference, but case law has traditionally looked somewhat skeptically at the notion of joint custody. In what continues to be regarded as the leading judicial pronouncement in this state on joint custody, Braiman v Braiman (44 NY2d 584 [1978]), the Court of Appeals described it as being appropriate only “[i]n the rare case” and as something to be “encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion” (id. at 589-590, 591).
Now, almost four decades since Braiman, appellate courts still tend to be reluctant to order joint custody absent an agreement by the parties or a showing that they can work well together (see e.g. Michael B., 145 AD3d at 430 [“Joint legal custody is not appropriate where . . . the parties’ relationship is characterized by acrimony and mistrust”]; Lubit v Lubit, 65 AD3d 954, 955 [1st Dept 2009] [“The evidence demonstrates that the acrimony and mistrust that marks the parties’ relationship makes joint custody a nonviable option”]; Matter of *984 Lee v Fitts, 147 AD3d 1058, 1059 [2d Dept 2017] [joint custody “is inappropriate where . . . the parties have demonstrated an inability to communicate and cooperate on matters concerning the child”]).
Not all Appellate Division decisions, however, have held firm on restricting joint custody to those parents who can reach an agreement and coexist amicably with one another. In Tatum v Simmons (133 AD3d at 551), the First Department found an award of “shared legal custody” to be appropriate despite “evidence of hostility and strife between the parties.” Similarly, in Matter of Johanys M. v Eddy A. (115 AD3d 460, 461 [1st Dept 2014]), the Court reversed the trial court and reinstated joint custody even though the record demonstrated that the parents were unable “to communicate directly with each other” (see also Matter of Batista v Falcon, 148 AD3d 698 [2d Dept 2017] [joint custody awarded despite case being heard in Integrated Domestic Violence Part]).
This case presents a good example of why, even in a situation where hostility and poor communication abound, courts, when called upon to designate legal custody, should opt, if at all possible, for designating both parents joint custodial parents, rather than making one the custodial and the other the noncustodial parent. Whatever the father’s idiosyncracies and personality flaws, he is undeniably a loving, capable, and devoted parent. Moreover, he is the type of involved father who coaches the child’s soccer team and is highly active in the child’s school’s parent association. To designate him a noncustodial parent would, in effect, label him—to the child and the rest of the world—as being somehow defective and inferior to the mother, who, in turn, would wear the crown of custodial parent. Under the circumstances presented here, it is difficult to see how it could be in the child’s best interests to have his father’s parental standing denigrated in this manner. Consequently, I find that the parties should be designated joint custodial parents.
This brings us then to the question of decision-making, the true essence of the parenting process. Here, too, I find that the child’s interests would be better served if there is a form of shared decision-making. To this end, as set forth below, there will be certain zones where each party, after full consultation with the other, will have final decision-making authority. There will be other zones where a hybrid format will apply, meaning that certain decisions that come within the ambit of that zone *985 will be subject to the tie-breaking vote of a parent coordinator or other designated professional.
In making my decision to employ zones, I am aware that the forensic psychiatrist recommended that the mother have across-the-board final decision-making authority. Although I have fully considered the concerns he articulated about utilizing zones, I find that they are outweighed by the risks that come with power being vested in the mother alone. One is that the father will be marginalized. The other is that a complete power imbalance will remove any incentive for the parties to be more inclusive in the decision-making process.
My decision to employ zones rests on a well-established foundation of case law approving of the process (see e.g. Matter of Ann D. v David S., 128 AD3d 520 [1st Dept 2015] [father awarded final decision-making with regards to child’s religion]; Rubin v Della Salla, 107 AD3d 60 [1st Dept 2013] [father awarded final decision-making authority over medical and educational matters; mother awarded religion, summer camp, and certain extracurricular activities]; Wideman v Wideman, 38 AD3d 1318, 1319 [4th Dept 2007] [“The court thus did not err in determining that it was appropriate to divide the decision-making authority with respect to the children”]; M.R. v A.D., 32 Misc 3d 512, 537 [Sup Ct, NY County 2011, Gesmer, J.] [parents found to be unable to “communicate effectively with each other and to make decisions jointly” granted “subject areas, or ‘spheres,’ in which each party will be the final decision maker”]).
Two older cases from the Appellate Division, First Department, that are especially relevant to the situation presented here are Mars v Mars (286 AD2d 201 [1st Dept 2001]) and Nimkoff v Nimkoff (74 AD3d 408 [1st Dept 2010]). In Mars, the father shared certain unpleasant character traits with the father in this case: he was found to be controlling and unable to respect the other parent’s “opinions and judgment” (286 AD2d at 202). Nevertheless, the Court, recognizing how vital it was to have both parents play a significant role in their child’s life, determined that it was necessary for the father to be given final decision-making authority over certain zones. In so holding, the Court stated:
“It is undisputed that each parent takes an active interest in the children’s lives and that it is in the children’s best interest that both parents remain involved with them, notwithstanding the parents’ *986 present intolerance for each other. . . .
“While there is significant precedent for dividing decision-making between parents, we are aware of no precedent for completely depriving a noncustodial parent, who is otherwise to remain fully involved with the children’s lives, of decision-making in all areas.” (Mars, 286 AD2d at 202-203.)
In the second case, Nimkoff, the Court, in contending with yet another acrimonious parental relationship, affirmed the trial judge’s determination in favor of shared parenting through zones of decision-making. It found that it was in the child’s best interests to divide authority so as “to maintain the respective role of each parent in the child’s life.” (74 AD3d at 409.) With the mother as the “child’s primary caregiver,” the Court found that granting zones to the father took into consideration “the strengths and weaknesses of both parents” and the “child’s need for nurturing, guidance and the meaningful involvement of both parents.” (Id.)
Having concluded that the meaningful involvement of both parents in the child’s life is best realized here by awarding each of them zones of decision-making—along with permitting each of them to claim the title of being a joint custodial parent—I now turn to defining which zone each parent will have. Generally, the two most important zones are education and medical. Ironically, in this case, these are the two areas over which there has been the least disagreement.
Because the child is happily attending his top-tier private school and can look forward to staying there until he graduates from 12th grade, there should be little need for educational decisions to be made outside of the extras, like tutoring and SAT preparation. Based on the father serving on the parent association at the son’s school and his being a trustee of the college he attended, I find that he is well-suited to be the final decision-maker in this zone. The one exception will be in the unlikely event the child needs to change from his current school. If consensus cannot be reached by the parents as to the new school that the child will attend, then a parent coordinator will cast the tie-breaking vote.
Happily, the child is healthy and, despite his parents’ acrimonious divorce, relatively well-adjusted. Almost as importantly for our purposes here, both parents are pleased with the pediatrician and the child therapist whom they selected together to attend to their child’s physical and mental *987 health needs. In light of the mother’s attention to the child’s needs and the child’s greater willingness to share his feelings with her than with the father, I find that she should have final decision-making authority as to medical issues. As with education, there will be one carve-out. That is, a provision requiring mutual agreement to change either the pediatrician or the therapist. Absent such an agreement, a parent coordinator will be empowered to break the deadlock by voting with one side or the other.
The remaining zones will not be subject to the hybrid provision of a tie-breaker vote. One reason is that there is nothing that falls within their ambit that is of such vital importance that a parent, after meaningful consultation with the other, cannot have unilateral say over the matter. The other reason is that, unlike those decisions which require a tie-breaker, one parent does seem better suited to exercise final decision-making authority within that particular zone.
With regards to summer camp, which has been a source of continual conflict, I find that the mother shall have final decision-making as to both what camp the child attends and how long he attends. Unlike the father, who strikes me as being intent on having the child emulate his experience as a youngster—or at least what he would like to believe was his experience—the mother appears to be focused more on the child’s needs and preferences. In making this award, I only ask that both parties reflect on how fortunate their child is that they have the means to send him to whatever camp he wants for as long as he wants to go.
As concerning extracurricular activities, I am troubled that the father is inordinately invested in what sports the child plays. While organized sports play an important role in promoting physical fitness, teaching the importance of team work, and other interpersonal skills, the parental strife it generates can be disproportional to its value. Such is the case here. As with camp, the father, who in no way strikes me as being particularly athletic, seems more focused on the experiences he had playing a particular sport—or again, what his gauzy view of his youth leads him to believe that experience was—than what sports the child himself wants to play. Accordingly, the mother will have final decision-making authority with regard to weekly organized sports activities, which by their nature take place on both parents’ parenting time. Naturally, each parent will be free to select extracurricular activities, athletic *988 or otherwise, that take place during his or her individual parenting time, but that do not conflict with sports programs selected by the mother.
The final zone to be assigned is religion. The mother is a nonpracticing Christian. The father is a lightly-practicing Jew. Because the evidence establishes that the parties intended to raise the child Jewish and sent him to a Jewish preschool, the father will have final decision-making with regard to the child’s religious upbringing. This authority, however, will not be unfettered. Rather, it will extend to little more than arranging for the necessary training and preparation for the child to have a Bar Mitzvah in a reform synagogue. One encouraging note is that the parents have agreed that they will share Jewish holidays—so that the mother can also partake in the child’s Jewish heritage—while at the same time having the child partake in Christian traditions. Thus, the child is assured of having the type of rich multi-denominational experience that benefits so many children in this city.
While a parent coordinator was not terribly helpful to the parties in the past, I am convinced that one can be helpful going forward. Even if one parent has final decision-making in a particular zone, that parent is still required to have meaningful consultation with the other parent and seriously consider his or her views. A strong parent coordinator will be able to set up and supervise the process by which that happens and, if necessary, rein in the father when he becomes too overbearing. If the parents are unable to jointly select a parent coordinator, I will appoint one on their behalf (see Matter of Koegler v Woodard, 96 AD3d 454 [1st Dept 2012]).
B. Physical Custody
Physical custody, or residential custody as it is sometimes called, has to do with which parent the child lives with the majority of the time. Under our state’s child support statute, support can only be received by the custodial parent. As was discussed, designating one parent custodial and the other noncustodial can often have negative consequences. Fortunately, there is no compelling reason to make a custodial designation, or even mention physical custody at all, in conjunction with child support. All that is needed in order to determine who receives and who pays support is to assess the amount of time the child spends with each parent (see Rubin, 107 AD3d 60 [parent with whom the child is with the majority of overnights is entitled to receive child support from the other parent]).
*989 In this case, it is agreed that the child will spend the majority of overnights with the mother. Thus, the mother will be entitled to receive child support from the father without the need to designate her the custodial parent or otherwise make a finding as to physical custody. Under these circumstances, the judgment need only provide that the child shall reside primarily with the mother.
C. Parenting Time
At one time, a noncustodial parent—or stated in more contemporary terms, the parent with whom the child does not primarily reside—was considered to have visitation with his or her child. The term “visitation” seems more applicable to what takes place in a hospital or a prison, rather than what should be substantial and meaningful time spent between a parent and a child. As a result, what we used to refer to as visitation is now more often called parenting time or parental access. These more expansive terms reflect the notion that both parents have the right, and the child the reciprocal right, to a real relationship where actual parenting, not merely visiting, takes place.
For more than two years, the parties here have been abiding by an interim schedule that sets forth what parenting time each parent will have with the child during the school year. Under this schedule, the father has five overnights and one 2x/4-hour long dinner with the child every 14 days. This time consists of alternate weekends (Friday through Sunday nights), an overnight that was recently changed to every Monday night, and a dinner with the child every other Thursday. Each side seeks limited changes to this schedule, all concerning the Thursday dinner: the father wants the dinner converted to an overnight, while the mother wants it to remain a dinner but have it take place on Wednesday, and have its duration reduced to one hour.
Although the current school year schedule may not be entirely satisfactory to either party, or even to the child, it nevertheless successfully fulfills the important and long-recognized mission of allowing the child to have regular and meaningful access with both his parents (see Weiss v Weiss, 52 NY2d 170 [1981]). Having considered the testimony of the parties, the testimony and the recommendations of the forensic psychiatrist, as well as what I learned from the child at the Lincoln hearing, I conclude that the schedule should remain in effect. The one modification, which the mother does not appear to op *990 pose, is that if Monday is part of an extended weekend with the mother, the father’s overnight shall occur on the first week ' night following the holiday.
All holidays, including Jewish holidays, and all school vacations shall be divided and alternated in the manner that they have under the interim schedule. With regard to the summer, the school year schedule will apply to the weeks that the child attends day camp. The remainder of the summer shall, as recommended by the forensic psychiatrist, be evenly divided between the parties.
As one can envision, in order for a parenting schedule to be successful, there needs to be some level of flexibility on behalf of the parents. Considering how poorly the parents relate to one another at his point, I harbor no real hope that they will be able to manage on their own to do the kind of occasional rescheduling that the demands of work and life sometimes require. Here again, the services of a tough and seasoned parent coordinator will undoubtedly prove invaluable.
III. Conclusion
The child in this case has much of what he needs to grow up healthy, happy and successful. Along with the best schools, tutors, doctors, therapists, enrichment activities, and summer camps that money can buy, he has the love and guidance of two highly educated and accomplished parents. The only thing standing in the way of the child having all that he needs is his parents’ inability to work together on his behalf. One can only hope that with this custody litigation having come to an end, the parties will seize the opportunity to chart a new and better course in raising their son.
Counsel are directed to settle a partial judgment on notice that is consistent with this decision.

. To be clear, neither party expressly asks for a specific custodial designation to be made. However, the cases cited in each of their posttrial briefs largely equate sole decision-making with sole custody, and shared decision-making with joint custody.

. This commonly referred to moniker is derived from the Court of Appeals case Matter of Lincoln v Lincoln (24 NY2d 270 [1969]), which approved a procedure for a judge to hear directly from the child with the record sealed and the child’s statements, unless he or she specifies otherwise, kept confidential.

. It is interesting to note that even with evaluations decrying the father’s lack of interpersonal skills in the workplace, he has managed to be promoted to a highly lucrative leadership role in a very successful company.